# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

a forensic image of a Gold Samsung Galaxy S7 with Brown Phone Case and Serial Number 359754072724858, more fully described in Attachment A

Case No. 19-M-122 (DEJ)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:
Title 18 USC Section 1591(a)

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Michael Thomae, TFO
Printed Name and Title

Sworn to before me and signed in my presence:

Date: May 31, 2019

_____
Judge's signature

City and State: Milwaukee, Wisconsin

David E. Jones, U.S. Magistrate Judge
Printed Name and Title

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Michael Thomae, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION AND AGENT BACKGROUND

1. I am a Detective with the Milwaukee Police Department and currently assigned to the Sensitive Crimes Division Human Trafficking Task Force. I have been in law enforcement for over 12 years. I have received training in the investigation of the crimes of Soliciting Prostitutes, Pandering, Keeping a Place of Prostitution, Human Trafficking, Trafficking of a Child, and Soliciting a Child for Prostitution. As a result of my training and experience, I have conducted investigations of prostitution and human trafficking related offenses that have led to the execution of search warrants and the arrest and conviction of many individuals. I am familiar with the street terms associated with sexual intercourse, sexual gratification, sexual contact, and masturbation.

2. I am a federally deputized law enforcement officer.

3. The facts contained in this affidavit are known to me through my personal knowledge, training, and experience, and through information provided to me by other law enforcement officers, who have provided information to me during the course of their official duties and whom I consider to be truthful and reliable. Some of the information was provided in response to administrative subpoenas and search warrants, and I believe that this information is also reliable.

4. I have included here only the information necessary to establish probable cause. There are additional facts and information I have learned through my investigation that are not included herein.

## II. PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED.

5. I make this affidavit in support of an application for the issuance of a warrant to search a forensic image of a Gold Samsung Galaxy S7 with Serial Number 359754072724858 (**Target Device**), (further described in Attachment A), which was seized from Calvin Freeman by the Las Vegas Metropolitan Police Department (LVMPD) during his arrest for sex trafficking on August 20, 2018. There is probable cause to believe that evidence of Freeman's sex trafficking in violation of 18 U.S.C. 1591 and interstate transport for prostitution in violation of 18 U.S.C. 2421(a) (further described in Attachment B) will be found in a search of the **Target Device**.

## III. PROBABLE CAUSE TO BELIEVE VIOLATIONS OF 18 U.S.C. 1591(a) HAVE OCCURRED.

*Investigation by the Las Vegas Metropolitan Police Department*

6. On August 20, 2018, at approximately 1915 hours, LVMPD dispatched a patrol officer to the Stratosphere Hotel & Casino located at 2000 S. Las Vegas Blvd, Las Vegas, NV 89104. The officer was dispatched because other officers were standing by with a potential sex trafficking victim who was waiting for her pimp to drop off her four year old child.

7. Vice officers from LVMPD responded to the scene to assist with the investigation.

8. LVMPD conducted an interview with an adult victim, hereinafter AV-1. AV-1 reported that she had been working as a prostitute for her boyfriend, Freeman, in Las Vegas. AV-1 identified Freeman as her pimp, and said that Freeman told AV-1 what rules to follow and amounts to charge for sexual services. Freeman instructed AV-1 that she had a minimum quota

of $500 per day. AV-1 estimated that she earned approximately $100,000 for Freeman between August 2017 and August 2018.

9. AV-1 stated that she worked at various known prostitution tracks in the Las Vegas area, including the Las Vegas strip and Tropicana corridor. AV-1 stated that Freeman utilized a cell phone application called Live 360 to track AV-1's whereabouts. AV-1 also stated that she and Freeman resided at 2120 Paradise Road Las Vegas, NV 89104 and in a Recreational Vehicle (RV) parked in the parking lot at that address. AV-1 stated that Freeman forced AV-1 to stay inside the residence when she was not working and that she was not allowed to leave. AV-1 stated that when Freeman was not present to watch her, he had others stay at the residence to prevent her from leaving.

10. AV-1 stated that Freeman demanded that AV-1 give Freeman all the money made by AV-1.

11. AV-1 stated that Freeman routinely demanded that she make more money and began beating her regularly, which caused AV-1 not to want to work for Freeman any more. AV-1 stated that Freeman repeatedly threatened to kill her if she attempted to leave him or stop working as a prostitute for him.

12. AV-1 disclosed that when AV-1 said things to Freeman that he did not want to hear, Freeman put AV-1's feces in her mouth, telling her that if she was going to feed him bullshit, he was going to feed her shit too.

13. AV-1 told officers that on August 16, 2018, she returned to 2120 Paradise Road after working as a prostitute. AV-1 had earned $600 that night, but kept $300 for herself to use to get away from Freeman. Freeman looked through AV-1's cell phone, realized that AV-1 actually made $600 that night, and demanded the additional $300. When AV-1 refused,

3

Freeman struck AV-1 with several belts inside the residence. Officers observed injuries on AV-1 consistent with AV-1's description of the beating.

14. AV-1 also told officers that she had gone to the hospital approximately three times for injuries caused by Freeman.

15. AV-1 also stated that Freeman forced her to leave her four-year old son alone in the residence at 2120 Paradise Road for a minimum of five hours while he took her to prostitution tracks.

*16.* Freeman was interviewed by LVMPD. He denied being a pimp, denied abusing AV-1 and denied forcing her to work as a prostitute. Freeman stated that he was employed as a mechanic by an auto repair shop despite the fact that he holds no license authorizing him to work as a mechanic. Based on the statements provided by AV-1 and the corroborating injuries on her body, Freeman was arrested by LVMPD and subsequently charged with Sex Trafficking and Accept/Receiving Earnings of a Prostitute.

*Investigation and Arrest of Freeman in Milwaukee*

17. On October 7, 2018, Milwaukee Police Department (MPD) officers responded to St. Joseph's Hospital for a Battery Domestic Violence Complaint. Upon arrival MPD officers spoke with the complainant, AV-1. AV-1 stated that she was abused by her live-in boyfriend, Freeman. AV-1 stated that upon arrival in Milwaukee, Freeman instructed AV-1 to sell her body and took her to the 3000 block of W. Lisbon in Milwaukee, and to Chicago to work as a prostitute. AV-1 stated that upon arrival at home, Freeman demanded the money AV-1 had earned and that when she told him she did not make any money, Freeman whipped her across her back and arms using the buckle side of a belt. After that, Freeman kicked her in her head, neck, and chest and stood on her head and stomped all over her body.

4

18. A citizen subsequently convinced AV-1 to go to St. Joseph's Hospital. Photographs of AV-1 taken by MPD at St. Joseph's Hospital corroborate AV-1's statements to MPD.

19. As a result of this incident, Freeman was charged with Human Trafficking in violation of WI 940.302(2)(b).

*Investigation of Human Trafficking in Violation of 18 U.S.C. 1591(a).*

20. As a result of the charges filed against Freeman in Milwaukee County, several law enforcement agencies involved in the Human Trafficking Task Force opened a larger scale investigation into Freeman's human trafficking operation.

21. The investigation has revealed that Freeman has been involved in an extensive human trafficking organization, operating in multiple states, dating back to at least the early 2000s.

22. As part of this investigation, law enforcement has interviewed AV-1 on a number of occasions. During those interviews, AV-1's statements have been consistent and AV-1 has provided additional information about Freeman's human trafficking, his force and threats of force against AV-1, and his use of force and threats of force against other victims. AV-1 has also provided information about the way in which she and others would provide Freeman with money they earned doing prostitution. Those methods included, but were not limited to, sending Freeman proceeds of prostitution activities in the mail and by electronic transfers through Western Union, Walmart2Walmart, and other wire methods. In many cases, AV-1 has been able to identify Freeman's additional victims by name, nickname, or photograph.

23. As part of this investigation, law enforcement interviewed a citizen witness (CW-1) who was familiar with AV-1 while she lived in Las Vegas, Nevada. CW-1 confirmed the

5

accounts of AV-1 and confirmed that he met AV-1 when working as an Uber and Lyft driver in Las Vegas. CW-1 stated that he knew AV-1 to work as a prostitute and knew that Freeman was her pimp. CW-1 stated that he frequently observed AV-1 with injuries on her body and stated that AV-1 told CW-1 that the injuries were caused by Freeman.

24. A review of records has revealed multiple police reports from various jurisdictions detailing Freeman's human trafficking operation. For example, police reports from Philadelphia, Pennsylvania on August 26, 2011, indicate that an adult female, AV-2, reached out to a Milwaukee police detective indicating that she was being held against her will by Freeman with violence and threats of additional violence. AV-2 disclosed to local Philadelphia police that she had been in Atlantic City New Jersey earlier in the day with Freeman, whom she identified as her pimp. AV-2 told police officers that Freeman put her on the street to have sex for money and that she was required to turn over all of the money she made to Freeman. AV-2 stated that on August 26, 2011, she informed Freeman that she no longer wanted to work for him and that, in response, Freeman assaulted her, choked her, and pulled her hair. AV-2 also stated that Freeman threatened to "bust her in her shit" with a firearm and stated that she had seen Freeman with a chrome firearm in the past.

25. I have recently been involved in interviews with AV-2 who disclosed additional information consistent with her statements to law enforcement in 2011. AV-2 described a history of violence and threats of violence used by Freeman to force AV-2 to engage in prostitution activities and to provide Freeman with the money earned from those activities. AV-2 also provided additional information about other women who were forced to engage in prostitution by Freeman for Freeman's financial gain, as well as the extensive and long-running human trafficking operation run by Freeman.

26. Similarly, on January 29, 2016, Freeman was arrested for kidnapping, conspiracy to commit kidnapping, robbery and battery domestic violence stemming from an incident that occurred in Las Vegas and involved AV-3. In that case, LVMPD officers responded to the MGM Hotel & Casino. While there, officers interviewed a suspected kidnapping victim, AV-3. AV-3 disclosed that she had been escorting for five years and that Freeman was her boyfriend. AV-3 stated that she recently left Freeman because he was violent and controlling. AV-3 stated that Freeman found her in the Casino and told AV-3 that she had to go home with him. AV-3 didn't want to make a scene so she walked outside to his car. While standing outside the car, AV-3 noticed another male in the passenger seat and stated that Freeman told her: "You have two options you can get in the vehicle willingly or by force." When AV-3 refused, Freeman and the other male passenger attempted to force her into the car.

27. Interviews with AV-1 and AV-2 have corroborated that AV-3 is also a victim of Freeman's human trafficking operation.

28. In addition to police reports, I have also reviewed banking records, social media records, and travel records. Those records corroborate the statements made by AV-1 and AV-2 and the police reports I have reviewed. They indicate that Freeman has been operating an extensive human trafficking operation that spans decades and several states. The records show that Freeman has a significant number of identified, and as yet unidentified victims. The records show multiple trips between Las Vegas, Milwaukee, New Orleans, Miami and other cities in which Freeman travels with women identified by AV-1 and AV-2, and in police reports, as potential victims of Freeman's human trafficking. They also reveal multiple wire transfers between Freeman's victims and Freeman as well as conversations between Freeman and his victims consistent with a human trafficking operation.

7

29. Through this investigation, I have also recovered ads for prostitution posted for AV-1 and others, which further corroborate witness and victim statements and other records obtained in this case.

## III. PROBABLE CAUSE TO BELIEVE EVIDENCE OF VIOLATIONS OF 18 U.S.C. 1591(a) WILL BE FOUND ON THE TARGET ELECTRONICS.

30. I know, from my training and experience, that human trafficking operations such as the one perpetrated by Freeman use wireless telephones to manage and maintain their operation by, for example, setting up prostitution dates, posting ads for prostitution, communicating with clients, communicating about sex trafficking activities, communicating with victims to threaten and exercise control, and evidence of tracking victims in real time using GPS monitoring.

31. In this case, some evidence of Freeman's sex trafficking has been found on wireless telephones belonging to Freeman's victims, including AV-1, and on other electronic mediums, such as social media account records. For example, law enforcement located messages indicating prostitution activities, as well as photographs of injuries caused by Freeman.

32. Based on my training and experience, as well as the evidence obtained to date in this investigation, I submit that there is probable cause to believe that the **Target Device** contains additional evidence of Freeman's human trafficking offenses including, but not limited to, photographs of Freeman's identified and unidentified victims, evidence of money transfers from Freeman's victims to Freeman, communications evidencing Freeman's violence and control, and other similar evidence.

### **TECHNICAL TERMS**

33. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the wireless telephone.

    b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard

9

drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

34.     Based on my training, experience, and research, I know that the **Target Device** has capabilities that allow it to serve as a wireless telephone, digital camera, and GPS navigation device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the **Target Device**.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

35.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on **the Target Device**. This information can sometimes be recovered with forensics tools.

36.     Based on my knowledge of this investigation, I know that the **Target Device** was forensically examined by the LVMPD when it was seized and that a digital image of that examination exists in LVMPD's custody.

37.     As part of this investigation, I have been provided with a copy of the forensic copy of the **Target Device** by the LVMPD. I have not reviewed that image pending approval of this Search Warrant.

38.     There is probable cause to believe that things that were once stored on **the Target Device** may still be stored on the **Target Device** and in the forensic copy of that device, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.

11

Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

12

39.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **the Target Device** was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on **the Target Device** because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

   b. Forensic evidence on a device can also indicate who has used or controlled **the Target Device**.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

40.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the forensic image of the **Target Device**, consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **Target Device** to human inspection in order to determine whether it is evidence described by the warrant.

41.  *Manner of execution.* Because this warrant seeks only permission to examine an image already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the

14

Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

42. Based on the foregoing, there is probable cause to believe that Freeman has engaged in Sex Trafficking by Means of Force, Threats, Fraud, and Coercion against AV-1, AV-2, AV-3, and others in violation of 1591(a) and that evidence of these crimes (further described in Attachment B) will be found in a search of the **Target Device** (further described in Attachment A).

## ATTACHMENT A

The **Target Device** to be searched is a forensic image of a Gold Samsung Galaxy S7 with Brown Phone Case and Serial Number 359754072724858.

# ATTACHMENT B

All records relating to violations of 18 U.S.C. §1591(a) and 18 U.S.C. 2421(a), from January 2000 to the present, including:

a. communications, including email, instant messaging, text messaging, multimedia messaging, and communications in third party apps;

b. All contact lists and records of communications with those contacts, including call logs and written messages of any kind;

c. All images, videos, travel records, information related to the identity of victims, and any other content or records on the phone.

d. All photographs or videos;

e. All records evidencing travel and device location information, including GPS locations, map or navigation apps, phone tracking apps, and Internet Protocol addresses;

f. All applications designed for receiving electronic payments and the stored contents of those apps, including but not limited to Cash App;

g. All web browsing history;

h. All evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, calendars, and saved usernames and passwords.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).